UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,                                         Case Number 23-20085

v.                                                        Honorable David M. Lawson

STEPHEN DUANE KEELS,

        Defendant.
_____/

## OPINION AND ORDER DENYING MOTIONS TO SUPPRESS STATEMENT AND TO DISMISS COUNT 1 OF THE INDICTMENT

Responding to a domestic violence call, Oakland County, Michigan sheriff deputies arrested defendant Stephen Keels at a home, where he was found in possession of drugs and firearms. He later confessed to agents of the Bureau of Alcohol, Tobacco, Firearms, and Explosives during a custodial interrogation. The grand jury charged Keels with possessing a firearm as a convicted felon (Count 1), possession with intent to deliver cocaine base (Count 2), and possession of a firearm in furtherance of a drug trafficking crime (Count 3). Keels has moved to suppress his statement, arguing that the interrogators ignored his assertion of his right to remain silent; and to dismiss Count 1, arguing that the statute defining the offense, 18 U.S.C. § 922(g)(1), violates the Second Amendment. The Court held an evidentiary hearing on June 12, 2023, at which the video recording of the interrogation was received in evidence. Because the defendant plainly waived his *Miranda* rights at the beginning of the interrogation and did not unambiguously re-assert his right to remain silent thereafter, his motion to suppress his statement will be denied. And because section 922(g)(1) does not offend the Constitution, his motion to dismiss Count 1 likewise will be denied.

I.

According to the affidavit and criminal complaint filed in this case, on January 30, 2023, at approximately 2:15 a.m., Oakland County sheriff's deputies responded to a 911 call reporting a domestic violence incident. The woman who made the call indicated that she had been "pistol whipped" by a man known as "SK," who was wearing a camouflage coat and wore his hair in dreadlocks down to his ears. She also reported that the man was armed with a 9mm pistol. While the officers were in enroute, the complainant reported that she was still being attacked, whispering to dispatch, "Please come now, he is beating me."

The officers arrived and were let into the home by a roommate, who indicated that "they are upstairs." Upstairs, the officers found the victim hiding behind her bedroom door with a cloth covering her bloody mouth. She indicated that her attacker was in the bathroom. When the officers knocked on the door and commanded that it be opened, the defendant responded, "Just a second," but did not open the door. Hearing sounds that indicated that the defendant was trying to escape, the officers forced entry and found the defendant sitting on the toilet. The defendant continued to resist the officers, who arrested him, placed him in handcuffs, and escorted him to the backseat of a patrol car. Near the toilet, a sheriff's deputy found a camouflage jacket, a Mossberg .22 caliber AR-15 with the serial number EMF3783464, a bloody Taurus G2C 9mm pistol with the serial number TLZ45547, and 42 grams of a white-rock substance in a baggie.

Officers transported the defendant to the Oakland County Jail where, around 12:00 p.m., ATF Task Force Officers Robert Bader and Kenton Weston conducted an interview, which was recorded on a video device. The officers began the interrogation by advising the defendant of his *Miranda* rights. The defendant acknowledged that he understood, said that he was prepared to continue with the interview, and signed a paper confirming that his rights had been read to him

and that he was willing to answer questions without a lawyer present. The officers then proceeded to explain to the defendant that the firearms they recovered earlier that morning previously had been used to commit gun violence, and that the purpose of the interview was to determine whether the defendant was the assailant of those prior acts. The defendant answered questions about what he was doing at the property, how the altercation began, and why he was in the bathroom when the police arrived.

About thirteen minutes into the interview, the officers circled back to the question of when the defendant came into possession of the recovered firearms.

> AGENT TWO: Like my partner said, those guns are tied to gun violence activity. Shootings that I don't believe you committed. But in order to go and keep you off of that, I need to know when you came into possession of those guns. So that I can go and say: The shooting that, that rifle's tied to, Mr. Keels says he was in possession of that gun from this day forward. So anything before then he's not responsible for.
>
> [ . . . ]
>
> AGENT TWO: Let's start with the Taurus the pistol. Do you remember when you got that? Was it this year?
>
> AGENT ONE:· We'll do it like this. It's end of January, right? Did you get it before New Year's? Did you get it before Christmas? Did you get it before Halloween? Did you get it before the summer? When did you get it? Did you get it yesterday?
>
> DEFENDANT: I'm trying to see. Basically I'm trying to —
>
> AGENT TWO: Are you struggling — now I'm not going to try and put words in your mouth. But are you struggling with the fact because — do you — have you ever shot that gun before?
>
> DEFENDANT: Mm-mm. [shakes head]
>
> AGENT TWO: No? Okay. I — Cause a — 'cause lot of times we go and we deal with people where they're afraid to go and put the timeline because they're like shit I have shot that gun before. And it might not have been in a criminal matter but it could be a thing where it's New Year's Eve. I'm out shooting around or hey, I'm celebrating something and popped off a couple rounds and, you know us, we

scoop up — we get calls for shots fired and we have to pick up brass just for anything.

DEFENDANT: Right. Right.

AGENT TWO: And a lot of times people go and be afraid to go and say I got it actually this time because I know I shot it and they're saying they can tell, you know, when this gun was shot. So is it — it's — is it one of those cases where you know you shot this gun off somewhere before and you're just afraid to say when?

DEFENDANT: Oh no. No. Actually — no. That's — that's not really —

AGENT ONE: So what is it? I mean — have I not set you straight from the jump.

DEFENDANT: Yeah.

AGENT ONE: What is it?

DEFENDANT: It's just the incriminating factor. Like I don't want to say nothing that — without, you know what I'm saying.

AGENT ONE: So why — why — why would it be incriminating? Are you — are you — you — you're — are you prohibited from having a gun?

DEFENDANT: Huh?

AGENT ONE: Are you prohibited from having a gun?

DEFENDANT: Yeah, I'm a felon.

Interview Video, Ex. 2, at 13:12-17:38; *see also* Interview Tr., ECF No. 30-2, PageID.117.

The officers then reiterated that they were trying to establish when the defendant took possession of the firearms to "absolve" him of the previous crimes committed with the guns and "mitigate" the defendant's risk. Interview Video, Ex. 2, at 17:45-19:25. The defendant responded by offering, "Let's just say I was never in possession of those weapons no earlier than summer." *Id.* at 19:25-19:46. He went on to explain that he purchased the firearms in June or July 2022, in two separate transactions, from two different individuals; that he shot a single round from the pistol into the ground in August 2022; and that he intended to use the guns "just kind of like a show kind

of — show to keep people off. . . . So yeah, basically just to keep people off my head and, you know, like show and tell type of thing. . . . I'm just defending just by, you know, just having it, you know." *Id.* at 19:46-25:30; *see also* Interview Tr., ECF No. 30-2, PageID.118-20. The defendant continued to answer questions about his possession and use of the recovered firearms during the rest of the interview, which lasted 42 minutes in total.

On February 9, 2023, the grand jury returned its three-count indictment against the defendant.

II.

Keels bases his suppression motion on the premise that he invoked his right to remain silent during the interrogation when he hesitated to respond to the agent's question about when he came into possession of the firearm, explaining, "It's just the incriminating factor. Like I don't want to say nothing that — without, you know what I'm saying." He asks that the Court suppress all statements he made thereafter as being obtained in violation of the Fifth Amendment. The government acknowledges that the encounter was a custodial interrogation, but it insists that Keels's statement that he did not "want to say nothing" was ambiguous and equivocal.

The iconic *Miranda* warnings that must precede police questioning of a person in custody have become embedded in our legal culture for nearly six decades. *Dickerson v. United States*, 530 U.S. 428, 443 (2000) ("Miranda has become embedded in routine police practice to the point where the warnings have become part of our national culture."). The warnings address the right to remain silent, *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), and may be waived by express or implied action, *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In this case, it is undisputed that the defendant initially made an express waiver of his rights. *See* Interview Video, Ex. 2, at 00:56-1:55, 2:40-2:51.

The right to remain silent, however, can be invoked after waiver. *See Miranda*, 384 U.S. at 473-74 ("Once warnings have been given, . . . [i]f the individual indicates in any manner, at any time . . . during questioning, that he wishes to remain silent, the interrogation must cease."). No "ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination," *Emspak v. United States*, 349 U.S. 190, 194 (1955), but the invocation of the right to remain silent must be unambiguous and unequivocal to constrain officers from further questioning, *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010). This requirement "results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Ibid.* (quoting *Davis v. United States*, 512 U.S. 452, 458-59, (1994)). "If an accused makes a statement concerning the right to [remain silent] that is ambiguous or equivocal or makes no statement, the police are not required to end the interrogation or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Ibid.* (internal quotation and citation excluded).

When viewing the entire record of the January 30, 2023 interrogation, Keels's contention that he unequivocally demanded to cease questioning does not withstand analysis. It is undisputed that he did state, "It's just the incriminating factor. Like I don't want to say nothing that — without, you know what I'm saying." Taken in isolation, the defendant might have an argument. "But context matters." *Bird v. Brigano*, 295 F. App'x 36, 38 (6th Cir. 2008).

The defendant made the "I don't want to say nothing" statement after struggling for several minutes to frame an answer to the officers' questions about the timeline of his firearm possession. *See* Interview Video, Ex. 2, at 14:04-17:10. First, he responded to a question about when he took possession of the guns by saying, "I'm trying to see." Next, he shook his head in response to the question whether he had "ever shot that gun before." Then, he indicated that his reluctance to

clearly answer the officers' questions had nothing to do with whether he "shot this gun off somewhere before." While responding to those three questions, the defendant looked at the ceiling, rubbed his eyes and chin, placed his face on his hand, scratched his head, muttered, and made other motions to indicate that he was thinking. And he never denied that he possessed the guns or invoked his right to remain silent. In that context, the "I don't want to say nothing" statement sounds "more like a loss for words than the invocation of a constitutional right." *United States v. Johnson*, No. 11-00049, 2011 WL 2604774, at *3 (W.D. Mich. June 30, 2011).

Moreover, the defendant made the "I don't want to say nothing" statement in response to a direct question about why he was afraid to give a straight answer about the timeline of his possession. It is reasonable to interpret the defendant's statement as a straight answer — because he was afraid of self-incrimination and was struggling to craft responses accordingly — and not as an invocation of his right to remain silent. That is particularly true in light of the fact that the defendant immediately proceeded to answer dozens of questions about his possession of the recovered firearms, without any hesitation. Keels "made no other statements that could arguably have clarified that he was invoking his right to remain silent." *Franklin v. Bradshaw*, 545 F.3d 409, 415 (6th Cir. 2008).

The Sixth Circuit has found similar statements to be ambiguous and equivocal when placed in context. In *Bird*, it found that the statement "I'm done talking about it" reasonably could have been "interpreted as simply an act of frustration." *Id.* at 38. In *Franklin*, it found that a defendant's "no" response to the question of whether he wanted to "tell his side of the story" was ambiguous, even though the defendant put his head down and avoided eye contact with officers when they asked other questions. *Franklin*, 545 F.3d at 415. And in *United States v. Amawi*, it found that the statements "I'm going to wait" and "is there a lawyer on board" to be "not sufficient to put the

agent on notice that a suspect has invoked his right to remain silent." 695 F.3d 457, 485 (6th Cir. 2012). The statement Keels made in this case is even more ambiguous and equivocal than these examples, because he himself qualified the statement "I don't want to say nothing" with the highly ambiguous and equivocal statement "without, you know what I'm saying." If the officers, reasonably, did not know what the defendant was saying — a conclusion supported by the record here — then they had no obligation to cease questioning at that time. *Berghuis*, 560 U.S. at 382.

Keels cites several decisions where other circuits found that defendants invoked the right to remain silent. All, however, are distinguishable on the facts. The defendant in U*nited States v. McCarthy*, 382 F. App'x 789, 792 (10th Cir. 2010), unambiguously stated that, "I don't want nothing to say to anyone," responded "no" when officers followed up to ask if he had "anything to say to anybody," then asked about his rights. The defendant in *Jones v. Harrington*, 829 F.3d 1128, 1140 (9th Cir. 2016), unambiguously stated, "I don't want to talk no more," and otherwise remained silent or gave short one-word answers to questions. And *Tice v. Johnson*, 647 F.3d 87, 107 (4th Cir. 2011), involved a detective's report noting that the defendant clearly "decide[d] not to say any more." None of the three statements were qualified, and the context of the statements in *McCarthy* and *Jones* suggests that the defendants expressed a clear reluctance to answer questions or make statements. Not so here, where, as explained, the context of the defendant's statement suggests that he was trying to answer the officers' questions but was struggling to find the words to do so.

Keels has not demonstrated that he unambiguously invoked his right to remain silent during the custodial interrogation. Therefore, his motion to suppress the statements he made during the interrogation will be denied.

III.

Keels contends that recent developments in Second Amendment jurisprudence requires that the Court declare 18 U.S.C. § 922(g)(1) unconstitutional. The Court disagrees.

For decades, courts have understood the Second Amendment to protect the right "to keep and bear Arms" for certain military purposes (i.e., for a "well regulated Militia"), but it did not create an individual right to possess and use guns for purely private, civilian purposes. *See*, *e.g.*, *United States v. Miller*, 307 U.S. 174 (1939); *see also Lewis v. United States*, 445 U.S. 55, 65 n.8 (1980) (reading *Miller* to hold that "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia'"). In 2008, however, the Supreme Court re-read the Amendment and discovered an "individual right [of 'the people'] to possess and carry weapons in case of confrontation," aside from any connection to "a well regulated Militia." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). But despite the recognition of that right, the Court was quick to point out that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill . . . ." *Id.* at 626.

Two years later, the Supreme Court held that "the right to keep and bear arms for the purpose of self-defense" in the home recognized by the Second Amendment "is fully applicable to the states." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 750 (2010). Federal courts adjudicating constitutional challenges to various state laws regulating the possession and use of firearms typically employed a two-phase analysis, with the first question asking whether the regulated activity "fall[s] outside the scope of the [Second Amendment] right as originally understood"; and if not, then assessing whether "the regulatory means the government has chosen" were appropriate in light of "the public-benefits end it seeks to achieve." *Ezell v. City of Chicago*,

846 F.3d 888, 892 (7th Cir. 2017); *see also United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012).

That analytical approach was rejected by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, --- U.S. ---, 142 S. Ct. 2111, 2131 (2022), the case upon which Keels principally relies here. Instead, it adopted a new "standard for applying the Second Amendment," *id.* at 2129, one solely "rooted in the Second Amendment's text, as informed by history," *id*. at 2127. The Court declared that "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id*. at 2129-30. And when a regulation burdens that conduct, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2130. At base, the Court held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122.

Some courts applying *Bruen*'s construct against challenges to the federal firearm statutes have approached the principal inquiry by asking if a particular litigant was among "the people" that the Second Amendment was intended to protect. *E.g.*, *United States v. Sitladeen*, 64 F.4th 978, 985 (8th Cir. 2023) (holding that "unlawfully present aliens are not within the class of persons to which the phrase 'the people' refers"); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 118 (3d Cir. 2023) (*en banc*) (Krause, J., dissenting) (observing that "the historical record demonstrates that, contrary to the majority opinion, legislatures have historically possessed the authority to disarm entire groups, like felons, whose conduct evinces disrespect for the rule of law"). Other courts have held that, despite the Supreme Court's seeming restriction of Second Amendment rights to only "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635, and "ordinary, law-abiding citizens," *Bruen*, 142 S. Ct. at 2122, the phrase "the people" applies to all

the people, including certain convicted felons and domestic spouse abusers, *Range*, 69 F.4th at 101–02; *United States v. Rahimi*, 61 F.4th 443, 451 (5th Cir. 2023).

In *Range*, the court held that 18 U.S.C. § 922(g)(1) was unconstitutional as applied to an individual who had been convicted 20+ years earlier of food stamp fraud under state law, "[b]ecause the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms." *Range*, 69 F.4th at 106. And in *Rahimi*, the court held unconstitutional the prohibition on firearms possession by people subject to domestic violence restraining orders under 18 U.S.C. § 922(g)(8), because it believed that the early American laws that led to weapons forfeiture only applied to offenders after criminal proceedings and conviction, and not to those who "have merely been civilly adjudicated." 61 F.4th at 458.

As noted, Keels bases his constitutional challenge to section 922(g)(1) on *Bruen*, and to a lesser extent on *Rahimi* and *Range*. His argument, however, is unpersuasive. First, *Bruen* does not upset the Supreme Court's consistent endorsement of felon disarmament. The Supreme Court explicitly stated in *Bruen* that it is "[i]n keeping with *Heller*." *Bruen*, 142 S. Ct. at 2126. There, the Court held that "[t]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for *lawful* purposes," and it said that "longstanding prohibitions on the possession of firearms by felons" are "presumptively lawful." *Heller*, 554 U.S. at 625-26, 627 n.26 (emphasis added). It reaffirmed that holding in *McDonald*, emphasizing that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill.'" 561 U.S. at 786. And both Justices Alito and Kavanaugh authored concurring opinions in *Bruen* emphasizing that *Bruen* does not disturb anything about *Heller* or other precedents, including those addressing "who may lawfully possess a firearm" or the "restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 142 S. Ct. at

2157 (Alito, J., concurring); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, J.) ("Nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons." (*quoting* Heller, 554 U.S. at 626)). These admonishments demonstrate that prohibitions on felon possession have historical roots. *See Range*, 69 F.4th at 114 (Schwartz, J., dissenting) (citing *United States v. Jackson*, 69 F.4th 495, 501-02 (8th Cir. 2023) (upholding the constitutionality of the federal felon ban as applied to a non-violent drug offender based, in part, on the Supreme Court's statements)).

Second, *Rahimi* and *Range* are outliers. Every other appellate court to consider section 922 since *Bruen* has upheld the statute's constitutionality. *See United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (section 922(g)(1) as applied to violent felons); *Sitladeen*, 64 F.4th at 984-87 (section 922(g)(5)(A)); *Jackson*, 69 F.4th at 501-02 (section 922(g)(1) as applied to particular defendant); *United States v. Haas*, No. 22-5054, 2022 WL 15048667, at *2 (10th Cir. Oct. 27, 2022) (section 922(g)(8)); *see also United States v. Hill*, No. 22-2400, 2023 WL 2810289, at *2 (7th Cir. Apr. 6, 2023) (noting that no appellate court has held that 922(g)(1) violates the Second Amendment post-*Bruen*). So, too, has this Court, and every federal district court in this circuit. *See Shelby-Journey-Egnis v. United States*, No. 21-20535, Dkt. No. 53 (E.D. Mich. Dec. 5, 2022) (Lawson, J.).

The facts and reasoning of *Rahimi* and *Range* also are distinguishable. The government charged Keels with a firearms offense, and Keels' criminal record includes felony convictions for child abuse and assault with a deadly weapon, Compl., ¶ 11, ECF No. 1, PageID.6 (and therefore Keels cannot credibly assert that he is "like Range," *see Range*, 69 F.4th at 131 (Krause, J., dissenting) (criticizing the court for jettisoning a "straightforward test" for barring firearm possession — a felony conviction — and replacing it "with an opaque inquiry — whether the

offender is 'like Range'")). Both the *Rahimi* and *Range* courts found historical precedents for disarming violent felons like Keels. The defendant cites no applicable authority finding that section 922(g)(1) is facially unconstitutional in light of *Bruen* or is unconstitutional as applied to him. More importantly, *Bruen* does not suggest that a court must analyze the criminal history of each charged felon to determine if his or her predicate crime fits within a constitutional firearm possession bar. In fact, the Supreme Court has repeatedly recognized that the emerging individual right to keep and bear arms, "should [not] be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626; *see McDonald*, 561 U.S. at 786 (plurality opinion); *Bruen*, 142 S. Ct. at 2156 (reiterating that the Second Amendment right is "subject to certain reasonable, well-defined restrictions"). In light of "these assurances," "and the history that supports them," the *Jackson* court "conclude[d] that there is no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)." *Jackson*, 69 F.4th at 502. This Court agrees.

Post-*Heller*, every appellate court has upheld the constitutionality of restrictions on the possession of firearms by felons under section 922. *See, e.g.*, *United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011); *United States v. Stuckey*, 317 F. App'x 48, 50 (2d Cir. 2009); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 900 (3d Cir. 2020); *United States v. Yates*, 746 F. App'x 162, 164 (4th Cir. 2018); *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010) (citing *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008)); *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010); *United States v. Joos*, 638 F.3d 581, 586 (8th Cir. 2011); *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009); *United States v. Rozier*, 598 F.3d 768, 770 (11th Cir. 2010); *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C.

Cir. 2019). The Sixth Circuit has done so repeatedly. *See, e.g.*, *United States v. Goolsby*, No. 21-3087, 2022 WL 670137, at *2 (6th Cir. Mar. 7, 2022) ("[W]e have repeatedly found that prohibitions on felon possession of firearms do not violate the Second Amendment." (quotation marks omitted)); *Stimmel v. Sessions*, 879 F.3d 198, 203 (6th Cir. 2018) ("By acknowledging that 'law-abiding, responsible citizens' are at the core of the Amendment's protections, the *Heller* Court presumed certain individuals can be 'disqualified' from exercising Second Amendment rights." (quoting *Heller*, 554 U.S. at 635)); *United States v. Frazier*, 314 F. App'x 801, 807 (6th Cir. 2008) ("We have long held congressional regulation of firearms constitutional.") (collecting cases); *United States v. Napier*, 233 F.3d 394, 403 (6th Cir. 2000) (noting that "[e]very circuit court which has had occasion to address the issue has upheld § 922 generally against challenges under the Second Amendment").

In light of this overwhelming precedent, there is "no reason" for the Court "to conduct an in-depth analysis" of whether the felon-in-possession statute is consistent with the historical tradition of firearm regulation. *United States v. Bluer*, No. 22-20557, 2023 WL 3309844, at *6 (E.D. Mich. May 8, 2023) (Michelson, J.); *see also United States v. Smith*, No. 22-CR-20351, 2023 WL 2215779, at *3 (E.D. Mich. Feb. 24, 2023) (Goldsmith, J.) ("Given the Supreme Court's direction on the constitutionality of felon-in-possession statutes . . . , this Court does not consider extensive historical discussion essential to resolving [the defendant's] argument" that section 922(g)(1) is unconstitutional under *Bruen*).

The prohibition on firearm possession by felons under section 922(g)(1) does not violate the Second Amendment, particularly as applied to Keels. The defendant's motion to dismiss Count 1 of the indictment therefore will be denied.

IV.

The defendant has not established that he unequivocally and unambiguously reasserted his right to remain silent during his January 30, 2023 interrogation. He has not shown that section 922(g)(1) is unconstitutional.

Accordingly, is **ORDERED** that the defendant's motions to suppress his statement (ECF No. 30) and to dismiss Count 1 of the indictment (ECF No. 31) are **DENIED**.

s/David M. Lawson<br>
DAVID M. LAWSON<br>
United States District Judge

Dated:   June 30, 2023